IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EDUARDO JIMENEZ-VALENIA,<br><br>Defendant. | ORDER AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:08 CR 395 (TC) |

Defendant Eduardo Jimenez-Valencia[1] asks the court to suppress evidence seized during a traffic stop. Although Mr. Jimenez-Valencia was driving a truck that did not belong to him, he argues that he has standing to challenge the search. Mr. Jimenez-Valencia contends that the search was invalid because the law enforcement officer exceeded the scope of the traffic stop when he searched the truck without Mr. Jimenez-Valencia's valid consent and because Mr. Jimenez-Valencia was prevented from limiting or withdrawing that consent. Even assuming that Mr. Jimenez-Valencia has standing, the court concludes that the search was proper, and the Motion to Suppress is denied.

---

[1]The court will refer to the Defendant here as Mr. Jimenez-Valencia even though his last name appears in several places in the record as Jimenez-Valenia. During the evidentiary hearing, his attorney explained that the Defendant's name is "Valencia." But according to the United States, the Defendant was indicted under the name Valenia because that is the name that appears in his U.S. Immigration and Customs file and that is the name that was on the identification that the Defendant provided during the traffic stop.

1

## FINDINGS OF FACT

Utah Highway Patrol Trooper Jared Withers was parked in his police car on June 3, 2008, in the median of I-70 in Emery County, Utah.  He was monitoring the speed of traffic in the eastbound travel lanes with his radar device when, in the distance, he saw a white Ford truck, the only vehicle in either lane, traveling at a high rate of speed.  Trooper Withers estimated that the truck was traveling at about seventy-eight miles per hour, far exceeding the sixty miles per hour posted speed limit.  He used his radar to confirm that the truck was speeding, traveling at seventy-three miles per hour.

As the truck approached, Trooper Withers could see that a crack ran "almost the entire way across the windshield."  (Tr. of Hr'g on Feb. 4, 2008 ("Tr."), 12.)  Trooper Withers also noticed that the truck "appeared to be taller than the normal little Ford Ranger truck that I've pulled over before."  (Tr. 12.)  Trooper Withers turned on the police car's emergency lights and followed behind the car.[2]

The truck pulled over to the side of the road and stopped.  Trooper Withers parked his police car several feet behind the truck;[3] he saw that the truck had a Missouri license plate.  He approached the truck on the passenger side and noticed that the tires seemed to be larger than normal, which he thought could be evidence that the body of the truck had been lifted.[4]  Trooper

---

[2]Although there is a video recording of the traffic stop, the video does not show the date or time.  Trooper Withers explained that at the time of the traffic stop, he had just gotten the police car from another officer, and this officer had "erased all the information off the video system.  This video system was a different model than I had had, and I didn't know how to program the date and time into it."  (Tr. 48.)

[3]Although Trooper Withers had a drug dog with him in the car, the dog played no part in the events.

[4]At the time of the traffic stop, Trooper Withers had received specialized training in narcotics interdiction, which taught him, among other things, how to recognize various indicators of criminal activity in passenger vehicles.  This included signs that a vehicle had been altered.

2

Withers explained to the driver, the Defendant, why he had been stopped.  Mr. Jiminez-Valencia

was the only person in the truck.  Trooper Withers asked Mr. Jiminez-Valencia for a driver's

license, registration for the vehicle, and proof of insurance.

As Mr. Jiminez-Valencia gathered the documents, Trooper Withers asked him where he

was coming from and where he was going.  Mr. Jiminez-Valencia told him he was coming from

California, where he lived, and he was traveling to Kansas.  Mr. Jiminez-Valencia told Trooper

Withers that he was going to see a friend in Kansas for a week.

During the conversation, Trooper Withers noticed a small black bag on the front seat of

the truck, which seemed like a small amount of "luggage for the length of stay.  I would expect

more luggage . . . [if] he was going to be there for a week." (Tr. 16.)  He also saw a "single key

in the ignition" with no other personal keys on the key ring. (Tr. 32.)  There were food wrappers

and coffee cups in the car.

Mr. Jiminez-Valencia gave Trooper Withers an Oregon driver's license with his photo

and the name Eduardo Jimenez-Valenia.  When he handed the license to Trooper Withers, Mr.

Jiminez- Valencia's hand was "slightly shaking."  (Tr. 19.)  Mr. Jiminez-Valencia did not have a

registration document nor proof of insurance, but  he gave Trooper Withers the title for the

---

Moreover, Trooper Withers grew up working on cars and trucks, and on at least one occasion, he
has installed a lift on a truck himself.

Although there are reasons for lifting the body of a truck that have nothing to do with
criminal activity, Trooper Withers explained that a so-called body lift "leaves the frame at its
normal height and it raises the body—separates the body from the frame, creating a void there."
(Tr. 14.)  Based on his training and experience, Trooper Withers knew that this void is often used
to create a hidden compartment for concealing contraband.

Because the truck lacked a "shifter on the transmission or near the transmission for
activating into a four-wheel-drive position" or a "button on the dash," Trooper Withers suspected
that this was only a two-wheel-drive truck.  (Tr. 15.)  The usual presence of larger tires on such a
truck was "very, very unlikely" and was a possible indication that the body had "been raised, the
suspension or body has been altered.  (Tr. 14.)

vehicle.  The title featured a VIN number, the name Juan Torrez Chavez, and the location of Kansas City, Missouri.[5]  When Trooper Withers asked who owned the truck, Mr. Jiminez-Valencia said that the truck belonged to a friend named Juan.

Trooper Withers asked Mr. Jimenez-Valencia if he would come back to the police car while Trooper Withers checked the documents.  Mr. Jimenez-Valencia agreed, got out of his truck, and walked back with Trooper Withers to the police car.  As the two men were walking, Trooper Withers quickly bent over and glanced under the passenger's side of the truck.  Trooper Withers asked Mr. Jimenez-Valencia to sit in the front passenger seat of the patrol car.

In the patrol car and with the Oregon driver's license in hand, Trooper Withers asked Mr. Jimenez-Valencia if the address listed was current.  Mr. Jimenez-Valencia said that it was not and provided an address in Santa Rosa, California.  Trooper Withers contacted dispatch and asked them to check the driver's license and criminal history for Mr. Jimenez-Valencia.  He specifically asked dispatch to run a check of the Oregon driver's license by number.

While waiting in the patrol car, Trooper Withers started to write a warning citation for Mr. Jiminez-Valencia.   He asked Mr. Jimenez-Valencia what he was planning on doing in Kansas.  Mr. Jimenez-Valencia explained that he was just going for a visit and immediately volunteered that he worked in many states on cooling towers for electric power plants.  Trooper Withers asked Mr. Jimenez-Valencia if he had taken a week off of work to travel to Kansas.  Mr. Jiminez-Valencia explained that sometimes he just moves to different places.

When Trooper Withers asked Mr. Jimenez-Valencia where he was going in Kansas, Mr. Jiminez-Valencia struggled for a while with the word "Topedo."  Trooper Withers asked whether

---

[5]Because it is "very easy to transfer ownership if you have the title" for a vehicle, Trooper Withers thought it was unusual that Mr. Jiminez-Valencia had the title.  (Tr. 17.)

Mr. Jimenez-Valencia did not know the name of the town and then asked, "Topeka?" (Tr. 21.)
Mr. Jimenez-Valencia immediately agreed.

While still drafting the warning citation, Trooper Withers asked Mr. Jimenez-Valencia
for his Social Security Number and address.  Mr. Jimenez-Valencia "rattled off a number that
was one more than your Social Security number should have." (Tr. 22.)  Trooper Withers asked
Mr. Jimenez-Valencia again, and he "rattled off another number.  He tried three different times to
give me a number." (Tr. 22.)  Finally Trooper Withers said, "Don't worry about it." (Tr. 22.)

The dispatch operator told  Trooper Withers that Mr. Jimenez-Valencia's Oregon driver's
license was valid, that he had no outstanding warrants for his arrest, and that he had no criminal
history.  Because Trooper Withers had previously forgotten, he asked the operator to check the
truck's VIN number, registration and license plate.

As the two waited in the police car, Trooper Withers asked Mr. Jimenez-Valencia more
details about his trip.  Mr. Jimenez-Valencia explained that he was going to Kansas to visit Juan,
the owner of the truck.  He said that Juan, whom he had known for two years, had driven the
truck to California with another person.  They had left the truck with Mr. Jimenez-Valencia in
California because it needed an oil change and other basic servicing.  Once Mr. Jimenez-
Valencia returned the truck to Juan in Topeka, he said that he would fly home to California.

Mr. Jimenez-Valencia told Trooper Withers that he was in between jobs and volunteered
information about jobs in his field that he had heard about.  He initially hesitated when Trooper
Withers asked what Juan did for work.  Then Mr. Jimenez-Valencia explained that he was
unsure.  He finally said that Juan worked in construction.  Throughout the entire conversation in
the car, Mr. Jimenez-Valencia seemed calm and friendly.

After the dispatch operator reported that neither the license plate nor the VIN number was

on file in Missouri, Trooper Withers said that he was going to check the VIN number on the truck.[6]  Mr. Jimenez-Valencia said nothing and remained in the police car as Trooper Withers walked to the truck and looked through the windshield at the VIN number on the dashboard.  As Trooper Withers was walking back to the patrol car, he glanced under the driver's side of the truck.

After Trooper Withers got back in the car, he asked Mr. Jimenez-Valencia if the truck could have been registered anywhere besides Missouri.  Mr. Jimenez-Valencia said that he didn't know.  Trooper Withers explained that he needed to look at the VIN number on the door of the truck.  He asked Mr. Jimenez-Valencia to come with him and open the door.

As the two stood near the truck, Mr. Jimenez-Valencia told Trooper Withers that Juan had never lived in another state and that he did not know how long Juan had owned the truck. After Trooper Withers checked the VIN number, the two men walked back to the police car. Trooper Withers told Mr. Jimenez-Valencia to wait in front of the police car.  Trooper Withers got in the car and asked the dispatch operator to check the VIN number against California records.  The VIN number on the title, windshield and the door of the truck were the same, but the operator reported that the number was not on record in California either.

Trooper Withers printed out the warning form, got out of his car, and approached Mr. Jimenez-Valencia, who was still standing in front of the police car.  Trooper Withers explained that he was only going to issue a warning for the traffic violations.  Visibly relieved, Mr. Jimenez-Valencia explained that this was good because he had recently received another citation

---

[6]Trooper Withers testified at the evidentiary hearing that when a license plate is not on file it could mean that the plate is no longer in circulation, that the car was recently registered, or that the license plate is false.

for speeding.  Trooper Withers handed Mr. Jimenez-Valencia the warning and explained that he

did not need to contact anyone about it.  Mr. Jimenez-Valencia made a joke about needing to

contact his insurance.  Trooper Withers told Mr. Jimenez-Valencia to have a nice day. [7]

As Mr. Jimenez-Valencia started to walk back to his truck, Trooper Withers turned away

from Mr. Jimenez-Valencia and towards his police car.  A moment later, Trooper Withers called

in a friendly and casual tone,  "Hey Eduardo.  Can I ask you a couple more questions about your

trip?"

Mr. Jimenez-Valencia stopped, walked over to meet Trooper Withers between the two

vehicles, and agreed to further questioning.  In response to Trooper Wither's questions, Mr.

Jimenez-Valencia explained that he was planning on paying for all of the gas and other expenses

for the trip.  He suggested that he was close to Juan and that was just the nature of their

relationship.  Mr. Jimenez-Valencia explained that although he had not yet purchased the airline

ticket to return to California, he expected that it would cost about $300.  During the entire

conversation, Trooper Withers was standing near the right edge of the road, a few feet away from

Mr. Jimenez-Valencia.

Trooper Withers asked Mr. Jimenez-Valencia if there was anything illegal in the truck.

Mr. Jimenez-Valencia shook his head no.  Trooper Withers specifically asked about marijuana

and cocaine.   Mr. Jimenez-Valencia shook his head.  Trooper Withers told Mr. Jimenez-

Valencia to look at him when answering.  Again, Trooper Withers asked whether there was

marijuana and cocaine in the truck.  While looking at Trooper Withers, Mr. Jimenez-Valencia

shook his head and said no.  Trooper Withers asked about heroin, and Mr. Jimenez-Valencia

---

[7]These facts are taken from the court's review of the video recording.

asked what that was.  Trooper Withers explained that it was another drug.  While directly looking at Trooper Withers, Mr. Jimenez-Valencia said no.  Finally, Trooper Withers asked about methamphetamine.  Mr. Jimenez-Valencia repeated the word and, while looking away, said no.

 Trooper Withers asked, "Is it okay if I search the truck?"  Mr. Jimenez-Valencia nodded his head affirmatively, gestured to the truck, and said, "Yea, yea."  Trooper Withers said, "I can?  Okay."

As he was walking towards the truck, Trooper Withers motioned to the side of the road near the passenger side and said, "For my safety, would you just go up there by the bushes.  If you need anything, my name is Jared . . . just yell my name."  Mr. Jimenez-Valencia put the warning paper in his truck and, as requested, went to stand about 100 feet in front of the truck.  From where Mr. Jimenez-Valencia was standing, he should have been able to clearly see the truck.

Trooper Withers proceeded to search the truck beginning with the bed.  He moved on to search the body, then the interior of the truck, including Mr. Jimenez-Valencia's black bag, before he crawled underneath the vehicle.  Throughout his search, Trooper Withers noticed various indications—including unusual welding marks, rust, and obvious structural changes—that the truck had been lifted and a hidden compartment had been installed.  At some point during the search, Trooper Withers noticed a rubber mat had been stuffed in a gap in the wheel well that was created by the lift.  In Trooper Wither's opinion, the rubber mat was used "to make it look like there [hadn't] been a lift put in the vehicle." (Tr. 92.)  Underneath the console inside the truck, he located the access door that led to the hidden compartment.  Mr. Jimenez-Valencia never attempted to withdraw or modify his consent at any time during the search.

After finding the access door, Trooper Withers called to Mr. Jimenez-Valencia and asked

8

him to come back to the truck.  Trooper Withers said, "I know there is a compartment in this truck," placed Mr. Jimenez-Valencia in handcuffs, and explained that although he was not under arrest, he was being detained until the contents of the compartment could be identified.  Trooper Withers pointed to the brush off the right side of the road near the truck and asked him to wait. As Mr. Jimenez-Valencia looked on, Trooper Withers returned to the truck and found nineteen large white packages containing methamphetamine inside the hidden compartment.

Trooper Withers placed Mr. Jimenez-Valencia under arrest, put him in the police car, and went back to the truck.  A few minutes later, Trooper Withers returned and read Mr. Jimenez-Valencia his Miranda rights.  After indicating that he understood those rights, Mr. Jimenez-Valencia immediately said, "Can I get all my personal stuff?  My medication and everything?" Trooper Withers responded, "We can worry about that . . . I'm interested in the drugs in the truck."

## ANALYSIS

### Standing to Contest the Search[8]

Mr. Jimenez-Valencia argues that he has standing to contest the search because he told Trooper Withers that the truck belonged to his friend Juan who was living in Kansas and implicitly explained that Juan had given him permission to drive the truck.  Mr. Jimenez-Valencia also points to the fact that he had the title to the truck which, according to Mr. Jimenez-Valencia, confirmed that the owner was Juan Torrez Chavez.   The government disagrees and

---

[8]Although the court is aware that the U.S. Court of Appeals for the Tenth Circuit would prefer courts "'not use the term 'standing' as shorthand for a defendant's capacity to challenge a search,'" the court does so here for clarity.  United States v. Smith, 531 F.3d 1261, 1266 n. 2 (10th Cir. 2008) (quoting United States v. Higgins, 282 F.3d 1261, 1270 n.3 (10th Cir. 2002)). This is the term used by the United States, Mr. Jimenez-Valencia and a great deal of the relevant case law.  E.g., United States v. Worthon, 520 F.3d 1173, 1177-78 (10th Cir. 2008).

contends that this evidence is not sufficient.   The government points to the fact that Mr. Jiminez-Valencia did not testify at the hearing.

Because the Fourth Amendment "'is a personal right that must be invoked by an individual,'" a defendant seeking to challenge a search must first demonstrate standing.  United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009) (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)).  To have standing, a defendant must show "'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'" Id.  (quoting United States v. Rhiger, 315 F.3d 1283, 1285 (10th Cir. 2003)).

In the context of an automobile search, this  means that a defendant "bears the burden of showing that he had a 'legitimate possessory interest in or . . . lawful control over the car.'"  United States v. Hock, 333 F.3d 1206, 1209 (10th Cir. 2003) (quoting United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000)).  Because "a defendant need not submit legal documentation showing a chain of lawful custody," a court will consider such factors as "'(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle.'"  Id. (quoting Allen, 235 F.3d at 489.)

The court agrees with Mr. Jimenez-Valencia that he has produced some evidence showing that  might have had a legitimate possessory interest in the truck.  But the court is not going to decide this motion on the question of standing because, even assuming that Mr. Jimenez-Valencia does have standing to challenge the search, the court concludes that the challenged search was lawful.

**Consent to Further Questioning**

Mr. Jimenez-Valencia concedes that the initial traffic stop and questioning was lawful. But he contends that Trooper Withers, after returning all the documents to him, exceeded the scope of the stop by almost immediately asking Mr. Jiminez- Valencia if he could ask more questions.

A traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and must not last any longer than is necessary to effectuate the purpose of the stop. United States v. Chavez, 534 F.3d 1338, 1343 (10th Cir. 2008). This means that absent a driver's consent or an objectively reasonable and articulable suspicion of illegal activity, an officer "ordinarily may not do more than ask to see a driver's license and registration and insurance documents, run a computer check on the car and driver, inquire about the driver's travel plans, and write out a citation." United States v. Vazquez, 555 F.3d 923, 928 (10th Cir. 2009). Ordinarily once "an officer has returned the motorist's license and other papers and issued any citation he intends to give, he must usually allow her to proceed on her way without additional questioning." United States v. Contreras, 506 F.3d 1031, 1035 (10th Cir. 2007).

But a continued encounter with law enforcement may become consensual if the officer has returned "the license and registration and asks questions without further constraining the driver by an overbearing show of authority." United States v. Villegas, 554 F.3d 894, 898 (10th Cir. 2009) (quoting United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)). Whether an encounter becomes consensual "'depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.'" Id. (quoting West, 219 F.3d at 1176).

When Trooper Withers explained that he was going to issue a warning for the traffic

violations, Mr. Jimenez-Valencia was visibly relieved.  With all of his documents in hand, Mr.

Jimenez-Valencia made a joke and even smiled as he shook hands with Trooper Withers.

Trooper Withers even told Mr. Jimenez-Valencia to have a nice day, a clear indication that Mr.

Jimenez-Valencia was free to leave.  See United States v. Ledesma, 447 F.3d 1307, 1315 (10th

Cir. 2006) (noting that "[p]hrases like 'thank you' and 'have a safe one' signal the end of an

encounter, and afford a defendant an opportunity to depart").

    After Mr. Jimenez-Valencia had started walking back to the truck, Trooper Withers called

in a friendly tone, "Hey Eduardo.  Can I ask you a couple more questions about your trip?"  Mr.

Jimenez-Valencia voluntarily started walking back to meet Trooper Withers and agreed to

answer more questions.   Nothing in the evidence, including the video recording, demonstrates

that Trooper Withers displayed an overbearing show of authority.

    And although the lapse in time before Trooper Withers called to Mr. Jimenez-Valencia

might have been brief, nothing about the circumstances of the encounter would have conveyed to

a reasonable person that he or she was not free to refuse the request and to terminate the

encounter.  Cf. Villegas, 554 F.3d at 899 (concluding consent to further questioning was

voluntary where defendant was in the police car and had the door open to leave when the officer

requested); United States v. Bradford, 423 F.3d 1149, 1159 (10th Cir. 2005) (concluding consent

to further questioning was voluntary where defendant was in the police car, was in possession of

her documents, and there was no coercive show of authority).

    Because the court concludes that the encounter was consensual, it does not consider

whether Trooper Withers had reasonable articulable suspicion of criminal activity.

**The Search**

     Mr. Jimenez-Valencia does not challenge the validity of his consent to the search.

Instead,  he argues that he was effectively prevented from limiting or withdrawing that consent when he was allegedly made to wait where he could not watch the search.  In support of this argument, Mr. Jimenez-Valencia directs the court to United States v. McWeeney, 454 F.3d 1030 (9th Cir. 2006), a case in which the U.S. Court of Appeals for the Ninth Circuit suggested that law enforcement's failure to allow an individual to witness a search might be evidence of coercion.[9]

In determining whether the consent to a search "was the product of an 'essentially free and unconstrained choice by [the] maker' or whether the consent was the product of 'duress or coercion, express or implied,'" a court must make a factual determination based on the totality of the circumstances.  United States v. Sawyer, 441 F.3d 890, 895 (10th Cir. 2006) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225, 227 (1973)).  Factors to consider "include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons."  Id.; see also United States v. Manjarrez, 348 F.3d 881, 887 (10th Cir. 2003) (considering whether defendant was unable to withdraw his previous consent to the search of a car where the "record . . . is devoid of any evidence" that law enforcement intimidated or coerced the defendant).

Here, Trooper Withers asked Mr. Jimenez-Valencia to wait in front of the truck for

---

[9]The defendants in McWeeney consented to the search of a car, but were not actually allowed to observe the search.  Considering this fact, the Ninth Circuit remanded the case to the district court to determine after an evidentiary hearing whether law enforcement had coerced the defendants into believing that they had no right to limit or withdraw their consent to a search.  To provide guidance on remand, the Ninth Circuit held that the district court's inquiry should be "whether the officers created a setting in which the reasonable person would believe that he or she had no authority to limit or withdraw their consent."  McWeeney, 454 F.3d at 1036.

officer safety purposes, a reasonable request considering the circumstances. Mr. Jimenez-Valencia was not under the supervision of any other officer. Trooper Withers never drew a weapon, he never raised his voice, and he never acted in a threatening manner.

Before the search, Trooper Withers invited Mr. Jimenez-Valencia to yell out if he needed anything. From where Mr. Jimenez-Valencia was waiting, approximately 100 feet in front of the truck, he should have been able to clearly see what was happening. Mr. Jimenez-Valencia was close enough to the truck that, even considering the noise from the freeway, he could hear Trooper Withers call to him and tell him to come back to the truck after the access door was found .

Considering these facts, the court concludes that Mr. Jimenez-Valencia's failure to limit or withdraw his consent was not the product of coercion. Even assuming the Ninth Circuit's rule from <u>McWeeney</u> is relevant or applicable here, there is no evidence that Trooper Withers deliberately prevented Mr. Jimenez-Valencia from witnessing the search so as to coerce him into believing that he could not withdraw or limit his consent.

**ORDER**

For the reasons explained, Mr. Jimenez-Valencia's Motion to Suppress is DENIED. (Docket No. 25.)

DATED this 1st day of May 2009.

BY THE COURT:

TENA CAMPBELL
Chief Judge

14